UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| DAN and MERRY HELCHER and | ) | |
| CINCINNATI BELL WIRELESS, LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 4:06-cv-102-SEB-WGH |
| | ) | |
| DEARBORN COUNTY, INDIANA | ) | |
| BOARD OF ZONING APPEALS, et al., | ) | |
| Defendants. | ) | |

**ENTRY GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION TO REVERSE THE
DECISION OF THE BOARD**

This cause comes before the Court on the Motion for Partial Summary Judgment

[Docket No. 27] filed by Defendants, the Dearborn County, Indiana, Board of Zoning

Appeals ("the Board" or "the Zoning Board") and its members,[1] and the Motion to

Reverse the Decision of the Board [Docket No. 29] filed by Plaintiffs, Dan and Merry

Helcher ("the Helchers") and Cincinnati Bell Wireless, LLC ("CBW") (collectively,

"Plaintiffs").  Plaintiffs brought this action after Defendants denied Plaintiffs' application

for a conditional use permit for a wireless communications facility ("WCF") to be

constructed and operated on property owned by the Helchers.  Plaintiffs assert that

Defendants' actions violated various provisions of the Telecommunications Act of 1996,

---

[1] In addition to the Board as a whole, the following individual board members are named
as defendants in their official and individual capacities: James Deaton, Chairman; Jake Hoog,
Vice Chairman; Jane Ohlmanseik, Secretary; Mike Hall, Appointed Plan Commission Member;
and Patricia Baker, Citizen Member.

47 U.S.C. § 332(c).[2]  The Board asserts that its decision was based on substantial

evidence and that it followed procedures fully compliant with the Act.  For the reasons

detailed in this entry, we <u>GRANT</u> Defendants' Motion for Partial Summary Judgment

and <u>DENY</u> Plaintiffs' Motion to Reverse the Decision of the Board.

## Factual Background

CBW, a wireless service provider, sought to erect a WCF on land owned by the

Helchers in order to ameliorate a coverage problem for CBW's customers along Jamison

Road.  Defs.' Mem. at 1.  The Helchers' land, located at 1128 Losekamp Road in West

Harrison, Indiana, is zoned "agricultural" under the Dearborn County Zoning Ordinance

("the Ordinance"), and is referred to as the "Bright West Cell Site."  <u>Id.</u> at 2; R. 1715;

Compl. ¶ 14.  In compliance with the Ordinance, CBW and the Helchers sought a

conditional use permit from the Zoning Board in order to erect a tower on the site.[3]

---

[2] In addition, Plaintiffs' complaint alleges violations of the takings, equal protection, and
due process clauses of the United States Constitution, as well as 42 U.S.C. § 1983; these claims
are not at issue in the motions currently before us.

[3] Article 15 of the Dearborn County Zoning Ordinance ("the Ordinance") governs the
placement, construction, and modification of Wireless Telecommunications Facilities ("WCFs")
within the County.  Ordinance (Defs.' Ex. Tab 2) § 1500.  The Ordinance provides that
telecommunications towers located on land zoned "agricultural" are subject to approval of a
conditional use permit.  Ordinance §§ 930(17), 1508.
Section 1514 of the Ordinance states that WCFs shall be located in accordance with a
priority system of nine zoning uses: highest preference is accorded to placement on existing
towers, then in manufacturing zones, then in highway interchange areas, etc.  The second-lowest
priority zone is agricultural property, followed by residential property.  The Ordinance provides
that "[i]f the proposed site is not the highest priority listed above, then a detailed explanation
must be provided as to why a site of a higher priority was not selected. . . . Sites of higher

(continued...)

2

Defs.' Mem. at 2, Defs.' Ex. Tab 14.

Dearborn County employs two consultants who assist it with review of zoning determinations related to wireless facilities: Dick Comi of the Center for Municipal Solutions ("CMS") and Ron Ebelhar of H.C. Nutting Company ("Nutting"). Nutting works under contract through CMS to Dearborn County, and the two companies have reviewed about twelve previous applications in the county. R. 1718. These consultants worked with CBW and the Helchers for nearly twenty months in preparing their application for the permit.

### The Application Process

On August 11, 2004, Plaintiffs took part in a pre-application meeting with Mr. Ebelhar, as required by the Ordinance.[4]  In this meeting, Mr. Ebelhar identified eighteen requirements under the Ordinance which would need to be addressed in Plaintiffs' WCF application.  Ebelhar memorialized the parties' discussion in an August 13, 2004 letter. R. 1041-42.

Plaintiffs, in their words, "worked diligently" to comply with the requirements of the ordinance, and six months later, on February 9, 2005, submitted their approximately

---

[3](...continued)
priority may not be by-passed by stating the proposed location is the only site leased or selected."

[4] Section 1510 of the Ordinance requires a party who is applying to build a WCF to meet with the County or with an agency designated by the County to review the application.  The purpose of this meeting is to address potential issues in order to expedite the review and permitting process.  Ordinance § 1510, R. 1028-29.

120-page WCF application to Nutting/CMS for review.  Pls.' Mem. at 5; R. 1043-1165.

Mr. Comi responded in a letter dated February 25, 2005, and identified fifteen

insufficiencies which he believed "should be addressed or provided in some form before a

recommendation can be made regarding the disposition of the application."  R. 1166.

These concerns ranged from fairly simple documentary requirements – e.g., the signature

of the landowner or other proof of the landowner's acceptance of the application – to

more complex calculations, assessments, and reports.  R. 1166-68.

Plaintiffs provided the required supplemental information to the consultants on at

least four occasions over the next several months in order to address the concerns raised

by Mr. Comi.  In addition, they made substantive changes to the WCF plan, including

reducing the tower's height from 250 to 190 feet (which concomitantly eliminated

Federal Aviation Administration requirements for lighting of the tower), and moving it

further from the property line in order to comply with setback requirements and eliminate

the need for a variance.  R. 1314-20, 1321, 1329; Pls.' Mem. at 6, 9.  Notably,

CMS/Nutting required Plaintiffs to show that several existing structures could not provide

the needed coverage; Plaintiffs assert that they investigated all the potential locations

CMS/Nutting requested of them during the review process and demonstrated that other

existing structures in the area were not suitable for co-location.[5]  R. 1169-71; Pls.' Mem.

_____

[5] Specifically, Plaintiffs identify three existing structures, described in their October 17, 2005 letter to CMS, which they reviewed as alternative locations for the wireless tower.  These are the West Harrison Tower, Bright Water Tower, and Mid Valley Pipeline Tower.  According to the letter, Plaintiffs rejected all three of these locations because they did not provide adequate

(continued...)

4

at 6.  Plaintiffs assert that their conclusions about these alternative locations were supported by RF [radio frequency] data and confirmed by CMS.  Pls.' Mem. at 7.

On January 23, 2006, after nearly eighteen months of review and preparation by Plaintiffs, Mr. Comi sent a letter to the Dearborn County Plan Commission stating that the consultants had completed their review of Plaintiffs' application, and, based on such review, recommending approval of the conditional use permit sought by Plaintiffs.  R. 1329.  Mr. Comi noted specifically that "[t]he issues identified in our previous review letters have now been resolved.  In particular, the tower has been reduced to a maximum height of 190.6 [feet,] . . . has been moved to comply with setback requirements and has been designed to accommodate four commercial carriers[.]"

### The Zoning Board Hearing

On March 14, 2006, the Zoning Board met and heard Plaintiffs' request for a conditional use permit.  At the meeting, Mr. Ebelhar delivered a technical report representing the analysis of CMS/Nutting which included his opinion that Plaintiffs had met the requirements necessary to construct the tower.  R. 1696 (minutes of meeting); R. 1718 (meeting transcript).

Every prior applicant for WCF construction in Dearborn County has been reviewed by CMS/Nutting, and, up to this point in time, all have been required to co-locate onto existing structures.  Mr. Ebelhar explained that, in his opinion, this served as

---

[5](...continued)
wireless coverage to Jamison Road.  R. 1169-71.

evidence that the Board's ordinance "is working since it clearly encourages the industry to co-locate wherever possible. . . . However, there are situations where no existing structures are available to allow the carrier to provide service within a given area of the county.  In those situations, a new tower is the only feasible way for that carrier to provide services, and this is one of those cases. . . . [Plaintiffs have] gone through a complicated process, and the ordinance is clear in many, many requirement[s] and they've done this."  R. 1718 (meeting transcript).  Mr. Ebelhar continued, noting that "[i]n our opinion, the applicant has demonstrated the need for the tower since there is clearly a gap in their coverage in this area. . . . Based on these comments, HC Nutting Company, in conjunction with the Center for Municipal Solutions, recommends that you grant approval for this new tower on the condition that the applicant completes the installation in accordance with the application and any building permits requirements and pays all appropriate fees."  R. 1718 (meeting transcript).

Following his presentation, Mr. Ebelhar was asked brief questions on two topics. First, he was asked by Board member Jane Ohlmanseik whether his report addressed the visual impact of the tower on the area, to which he responded:

> MR. EBELHAR:  Well, we're certainly concerned with the least visually intrusive, but they need a minimum height in order to provide the service.  And I believe that they are - - have complied with the spirit of the application to provide the least visually intrusive applications that they can in this case.
>
> MS. OHLMANSEIK: And that - - And you're saying that because of the reduced height and the elimination of the lighting requirements?

6

MR. EBELHAR: Yes, ma'am.[6]

In addition, Board Vice Chairman Jake Hoog asked Mr. Ebelhar for clarification concerning the person who had performed the studies to determine if a need for the tower existed.  Mr. Ebelhar responded that Plaintiffs had done the studies and that they were reviewed by CMS.  Id.  Based on the record, it does not appear that the Board asked any other questions regarding CMS/Nutting's review of Plaintiffs' application.  Pls.' Mem. at 10.

Several landowners spoke at the meeting in opposition to the permit, expressing their concerns that the WCF would negatively impact their neighborhoods, that it would be visually intrusive, and that it would decrease their property values.  R. 1682-83. Nelson Elliott, a licensed auctioneer and certified real estate appraiser, discussed these and other concerns regarding hazards involving children in the area and potential dangers related to winds and ice.  R. 1685.  The Board also heard testimony from Greg Dale, a community planner with the planning and zoning firm of McBride Dale Clarion, who stated that, in his opinion, Plaintiffs had not met the requirements of the Zoning Ordinance regarding the visual impact of the proposed facility – specifically with regard to paragraph 23 of Section 1512 of the Ordinance, which requires the applicant to furnish a Visual Impact Assessment relating to the proposed tower.  R. 1686 (minutes), R. 1736-1739 (transcript).

---

[6] R. 1719.

The Board also reviewed a report prepared by Wireless Applications Corporation ("WAC"), a consulting firm hired by Karen and David Cody, who were among the remonstrators.  That report was presented at the meeting by Lisa Lehner, an attorney representing the Codys.  It acknowledged that the proposed WCF would provide coverage along Jamison Road, but questioned whether other possible sites could serve as superior alternatives with a smaller impact on the surrounding community.  R. 1739-1741.  Renee Webb, an engineer for CBW, spoke in rebuttal, noting that CBW's studies indicated that the 190-foot height was necessary to ensure the best coverage and that CBW had reviewed four other potential sites as possible locations for the WCF.  R. 1704.

At the conclusion of the hearing, Board member Patricia Baker moved to deny Plaintiffs' application for the following reasons, as described in the eventually-approved meeting minutes:

> . . . as a result of the Applicant's noncompliance with the following ordinances: Article 3, Section 315, Item b, which states that the facility will be designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity and which shall not change the essential character of the area; Article 3, Section 315, Item d, which states that the facility will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district; and Article 15, Section 1514, Sub 5 in which the Applicant conflicted with the provisions of the Zoning Ordinance by failing to adequately illustrate that all other hilltops and potential sites in the area had been investigated.

R. 1706 (minutes).  The Board elected to deny Plaintiffs' request for a conditional use

permit by a vote of three to one.[7]

### *Approval of the Minutes and Procedural History*

Plaintiffs assert that the recording of the hearing did not capture approximately the final hour of the proceedings, and it is clear that the transcript in the record "cuts off" abruptly before the conclusion of the hearing.  R. 1743.  Plaintiffs assert that the transcript omits the rebuttal provided by them following the presentations by the remonstrators; they claim that the failure to record the entire hearing led to "an inaccurate reporting of the Motion made by the Board to deny the Application, but equally important, the Transcript does not capture all of [Plaintiffs'] rebuttal to the issues raised and, as a result, many of those comments are either omitted or not explained in sufficient detail, to the material detriment of [Plaintiffs]."  Pls.' Mem. at 13-14.  Plaintiffs also complain that the record maintained by the Board is disorganized, not maintained in chronological order, and potentially incomplete.  Id. at 14.

At the May 9, 2006, meeting of the Board, some disagreement ensued as to the approval of the March 14, 2006 meeting minutes.  Certain members of the Board as well as representatives for Plaintiffs and for the adjoining landowners suggested numerous revisions to the minutes, many of which were disputed.  The Board therefore voted to table the minutes until the next Board meeting.  R. 1792.

On June 9, 2006, Plaintiffs submitted a letter to the Board requesting that it not

---

[7] Though there are five Board members, the Chairman votes only to break a tie among the other four members.  Defs.' Mem. at 6.

approve the minutes as revised and that it reconsider its decision to deny Plaintiffs'

permit.  R. 1855-59.  At the next Board meeting, on June 13, 2006, the Board approved

the minutes as revised and further refused Plaintiffs' request to reconsider its decision to

deny the WCF permit.  R. 1864-78.

On July 12, 2006, Plaintiffs filed a complaint against the Board, which alleged

several violations of the Telecommunications Act of 1996.  Specifically, the complaint

asserts that: the minutes are not based on substantial evidence as required by the Act

(Count I); the minutes are not a sufficient written decision as required by the Act (Count

II); the minutes unreasonably discriminate among service providers in violation of the Act

(Count III); and the minutes have the effect of prohibiting the provision of wireless

communications services in violation of the Act (Count IV).  The complaint further

asserts claims under the procedural and substantive due process clauses and the equal

protection clause of the Fourteenth Amendment, the takings clause of the Fifth and

Fourteenth Amendments, and 42 U.S.C. § 1983.  On October 16, 2006, Defendants filed a

Motion for Partial Summary Judgment on Plaintiffs' Telecommunications Act claims

(Counts I through IV).  On the same day, Plaintiffs filed a Motion to Reverse the Decision

of the Board.  We address the parties' arguments in turn below.

## <u>Legal Analysis</u>

## I.    **Applicable Standard of Review**

As an initial matter, we must determine the standard of review applicable to this

dispute, an issue about which the parties disagree.  The Board's motion seeks summary judgment and articulates the familiar standard contained within Federal Rule of Procedure 56(c): that summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding whether genuine issues of material fact exist under this standard, we construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.  Id. at 255.

Plaintiffs, however, assert that our review, pursuant to the Telecommunications Act, is in the nature of an appeal, and that summary judgment motions are inappropriate vehicles when a district court is asked to rule in an appellate capacity.  Plaintiffs rely primarily upon Primeco Personal Communications v. City of Mequon, 242 F.Supp.2d 567, 574 (E.D. Wis. 2003) ("Primeco I") and Primeco Personal Communications v. City of Mequon, 352 F.3d 1147, 1148-49 (7th Cir. 2003) ("Primeco II").  In Primeco I, the parties filed cross-motions for summary judgment disputing whether the city's denial of plaintiff's application to construct a WCF violated the Telecommunications Act.  The district court nonetheless opted to treat the parties' submissions as motions to reverse or affirm the city's decision, noting that "in cases involving review of municipal decisions under the [Telecommunications Act], summary judgment motions are cumbersome and unnecessary. . . . The purpose of a summary judgment motion is to determine whether a case should proceed to trial, but in cases where courts review the decisions of other

bodies the 'trial' has already taken place." 242 F.Supp.2d at 574. Therefore, the applicable standard of review is whether the municipal body's decision was "supported by substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii). Following the Primeco I analysis, we also shall apply a "substantial evidence" standard in conducting our review here and will treat the Board's summary judgment motion as a motion to affirm its prior action.

In Primeco II, the Seventh Circuit affirmed Primeco I and used that decision as an opportunity to describe in greater detail the "substantial evidence" standard. Judge Posner likened the standard to the "clearly-erroneous standard . . . [which] is used [by appellate courts] to guide the application of a legal standard to district court factfindings . . . the question in this case comes down to whether the [zoning board] was clearly in error to turn down [the plaintiff's] application, in light of the evidence that had been placed before the commission." 352 F.3d at 1149. This standard has been described as a "deferential" review of the record to determine if it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Aegerter v. City of Delafield, 174 F.3d 886, 889 (7th Cir. 1999) (internal citation omitted) (applying this standard in the context of the Telecommunications Act). Through this lens, we now shall proceed to examine the contentions of the parties.

## II.   Timeliness of Plaintiffs' Claims

The Board asserts initially that it is entitled to summary judgment on Plaintiffs'

claims under the Telecommunications Act because the claims are time-barred by state and federal statute.  Indiana Code § 36-7-4-1003 provides that a person aggrieved by the decision of a zoning appeals board may file a petition for judicial review of that decision within thirty days of the date of the board's decision.  Similarly, the Telecommunications Act provides that a person adversely affected under the statute by the "final action or failure to act" by a local government may bring suit in a court of competent jurisdiction "within 30 days after such action or failure to act[.]"   47 U.S.C. § 332(c)(7)(B)(v).  The Board meeting at which Plaintiffs' WCF permit was denied occurred on March 14, 2006; the minutes of that meeting were approved on June 13, 2006; and Plaintiffs filed their complaint on July 12, 2006.

The Board asserts that the date of the decision from which Plaintiffs seek redress was March 14, 2006 – the date of the Board meeting at which the Board denied Plaintiffs' conditional use permit request.  Because Plaintiffs did not file the instant suit until July 12, 2006, the Board reasons that the claim falls outside the thirty-day window for judicial review.  The Board cites Biggs v. Board of Zoning Appeals of City of Wabash, 448 N.E.2d 693, 694 (Ind. Ct. App. 1983), in support of this argument.  In Biggs, the Indiana Court of Appeals held that a plaintiff's complaint fell outside of the thirty-day limitations period when it was filed more than thirty days after the zoning board rendered its decision, but within thirty days of the date the minutes were approved.  In so holding, the Court stated that "[m]inutes are a recordation of events that have previously occurred. They are not the event, but a record of the transpired event.  The event, a decision on a

13

variance request made by a vote, occurred on [the date of the board meeting] regardless of when, if ever, it was memorialized."  The Board argues that we should apply the reasoning in <u>Biggs</u> and dismiss Plaintiffs' claims as time-barred.

Plaintiffs counter that the thirty-day clock begins to run not on the date of the denial of their permit, but instead on the date the minutes of that meeting were approved – that is, June 13, 2006.  Because of the "numerous changes and corrections" proposed to the minutes at the May 9, 2006 meeting, the minutes were not approved until nearly three months after the initial denial; the Board's action thus was not "final" until that date. Plaintiffs cite <u>Omnipoint Holdings, Inc. v. City of Southfield</u>, 355 F.3d 601, 605 (6th Cir. 2004) as support; in that case, the Sixth Circuit held that the actions of a city council became "final" when a council resolution and minutes were approved – *not* when the vote on that resolution was initially taken – because the resolution provided a written record describing the reasons for denial of the plaintiff's request.  Therefore, the thirty-day clock did not begin to run until the date of approval.

The Board rejoins that, because the Telecommunications Act does not explicitly define the phrase "final action," we must look to state law to determine when the clock begins to run.  We decline the Board's invitation to apply this approach; rather, we find the reasoning in the <u>Omnipoint</u> decision more persuasive, noting that other federal courts who have construed the statute of limitations set forth in this section of Telecommunications Act have also applied a similar analysis.  For example, the District Court for the Eastern District of Michigan, in confronting the precise question at issue

14

here in <u>Laurence Wolf Capital Management Trust v. City of Ferndale</u>, 176 F.Supp.2d 725 (E.D. Mich. 2000), noted that the plaintiff had not filed its claim within thirty days of the date of the zoning board meeting at which its variance was denied; rather, it filed its claim within thirty days of the board's approval of the minutes of that meeting.  The Court, in examining the legislative history of the Telecommunications Act, determined that a party cannot commence an action under the Act without knowing the reasons for the zoning board's unfavorable decision, and that a final, reviewable action depends upon a valid written decision supported by substantial evidence.  The Court concluded that such a written decision was not rendered until the approval of the minutes, preventing plaintiff's claim from being time-barred.

Applying the same reasoning here, we reach the same conclusion.  Assuming *arguendo*[8] for the purpose of construing the statute of limitations that the Board's minutes constituted a written decision as contemplated by the Act, the thirty-day window did not begin to run until after that decision was finalized – that is, when the minutes were approved on June 13, 2006.  Indeed, the conflict over the accuracy of the minutes which delayed the Board's approval thereof serves as strong evidence that the Board's *final* action was not rendered until this date.  Therefore, we hold that Plaintiffs' claims under the Telecommunications Act are not time-barred, and we shall proceed to a review of the merits of the parties' motions.

---

[8] As we discuss in detail below, the Board's minutes did, in fact, constitute a written record as contemplated by the Telecommunications Act.

**III.    The Telecommunications Act of 1996**

The Telecommunications Act of 1996 was enacted in order "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'" City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005) (quoting 110 Stat. 56).  See also Town of Amherst v. Omnipoint Communications Enterprises, 173 F.3d 9, 13 (1st Cir. 1999) (describing the relevant statutory provision as "a deliberate compromise between two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.").  As the Seventh Circuit noted in Primeco II, one of the concerns which led to the enactment of the Act was that local governments' zoning decisions were unreasonably limiting the growth of wireless services.  352 F.3d at 1147.  As a result, Congress imposed specific limitations on the authority of state and local governments to regulate the placement of such facilities.

Under the Act, the regulation of the placement, construction, and modification of personal wireless service facilities by state and local governments may not "unreasonably discriminate among providers of functionally equivalent services," 47 U.S.C. § 332(c)(7)(B)(i)(I), and may not "prohibit or have the effect of prohibiting the provision of personal wireless services," 47 U.S.C. § 332(c)(7)(B)(i)(II).  In addition, any denial of a request to place, construct, or modify a wireless service facility "shall be in writing and

supported by substantial evidence contained in a written record." 47 U.S.C. §

332(c)(7)(B)(iii). It is these limitations which are at issue in this case, and accordingly

we consider each contested provision of the Act in turn below.[9]

### A.    The Requirement that the Board's Denial Be in Writing

Plaintiffs first contend that the Board's denial of its conditional use request

violated 47 U.S.C. § 332(c)(7)(B)(iii) because the denial was not "in writing" as required

by the Act. Plaintiffs raise two related arguments related to this requirement: the validity

and accuracy of the Board-approved minutes, and whether those minutes comprise a

written decision as required by the Telecommunications Act.

### 1.    Accuracy of the Minutes

Plaintiffs first complain that the Board-approved minutes are inadequate and

inaccurate due to the Board's failure to record the entire hearing – including notably

Plaintiffs' rebuttal to the issues raised by remonstrators. Plaintiffs assert, but somewhat

generally, that this incompleteness redounded to their "material detriment." Pls.' Mem. at

14.

The Board responds that the proceedings were accurately and sufficiently

recorded. It submits in support of that assertion the affidavit of Rita Beck, a Board staff

member who was responsible for recording the Board meeting and preparing the minutes.

---

[9] The Act grants any person adversely affected by a state or local government's failure to
comply with these limitations the power to commence an action against that entity in a court of
competent jurisdiction. 47 U.S.C. § 332(c)(7)(B)(v).

Beck affirms that it is her practice to take handwritten notes at Board meetings as a backup in case of tape recorder malfunction, and that she did so at the March 14, 2006 meeting.  She attests that, to the best of her knowledge, her notes truly and accurately reflect what occurred during the meeting.  Beck Aff. ¶¶ 3-8.[10]  Therefore, the Board maintains, the minutes represent an accurate reflection of the business conducted at that meeting.

We shall accord to the Board-approved minutes the status of being an accurate account of what transpired at the Board meeting.  In their briefs, Plaintiffs have not identified any specific falsehoods, inaccuracies, or omissions contained within the minutes as a result of the recorder failure; they merely assert that they have suffered a generalized "material detriment."  Such an objection is factually and legally insufficient, particularly in view of the fact that we have been given no reason to discredit the accuracy of Ms. Beck's notetaking.  In Indiana, boards of zoning appeals are required to maintain a reasonably accurate summary of the proceedings before them, but not a verbatim transcript.  See Allen v. Board of Zoning Appeals for the City of Noblesville, 594 N.E.2d 480, 482-83 (Ind. Ct. App. 1992) (holding that a board of zoning appeals is

_____

[10] Plaintiffs assert in their reply that Beck's affidavit constitutes "new material" introduced by the Board to which they should be permitted to respond as contemplated by the Case Management Plan.  Pls.' Reply at 1.  Plaintiffs have not, however, raised any *substantive* objections to Beck's affidavit in their reply, though that would seem to have been the opportune occasion for doing so.  Therefore, we consider Beck's affidavit in our analysis, noting that "although the TCA requires the BZA's decision to be supported by substantial evidence in a written record, there is no provision in the TCA expressly limiting this court's review of the case to that evidence."  AT&T Wireless PCS, Inc. v. Town of Porter, 203 F.Supp.2d 985, 988 (N.D. Ind. 2002).

required to maintain "a reasonably accurate *summary* of the evidence presented to it. Such a requirement does not necessarily or impliedly mandate the production of a verbatim transcript of the evidence presented to the board." (emphasis in original)). Moreover, the Telecommunications Act does not impose a stricter recordkeeping requirement than does Indiana law or demand the use of a tape recording device. Therefore, we regard the minutes as approved as constituting an accurate restatement of the proceedings before the Board.

      2.      <u>Whether the Minutes Constitute a Sufficient Written Decision Under the Telecommunications Act</u>

Plaintiffs further maintain that the Board's denial of their conditional use permit application was not "in writing," as mandated by the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii).  The text of the Telecommunications Act does not define precisely what is meant by a "writing," and our research suggests that the Seventh Circuit has not yet had the opportunity to interpret this provision.[11]  Other courts, however, have construed the writing requirement imposing differing degrees of stringency.  <u>See generally</u> <u>APT Pittsburgh Ltd. Partnership v. Penn Township Butler County of</u>

---

[11] In <u>VoiceStream Minneapolis, Inc. v. St. Croix County</u>, 342 F.3d 818, 831 n.4 (7th Cir. 2003), the Seventh Circuit noted that, because the parties therein did not dispute that the Board's decision met the writing requirement, it had "no occasion to consider the 'in writing' requirement of § 332(c)(B)(iii) at this time."  <u>Id.</u>  The Court cited <u>New Par v. City of Saginaw</u>, 301 F.3d 390, 395 (6th Cir. 2002), <u>Southwestern Bell Mobile Systems, Inc. v. Todd</u>, 244 F.3d 51, 60 (1st Cir. 2001), and <u>AT & T Wireless PCS, Inc. v. City Council of City of Virginia Beach</u>, 155 F.3d 423, 430 (4th Cir. 1998), all discussed *infra*, demonstrating its awareness of the circuit split on this issue; however, it did not indicate whether it considered any of the approaches taken in these cases persuasive.

Pennsylvania, 196 F.3d 469, 474 n. 4 (3rd Cir. 1999) (noting the lack of uniformity

among courts as to the issue).

Plaintiffs attempt to persuade us to adopt an approach similar to that employed by

the Sixth Circuit in New Par and by the First Circuit in Southwestern Bell.  In New Par,

the Sixth Circuit interpreted the Telecommunications Act's "in writing" requirement to

mean that the denial "must (1) be separate from the written record; (2) describe the

reasons for the denial; and (3) contain a sufficient explanation of the reasons for the

denial to allow a reviewing court to evaluate the evidence in the record that supports

those reasons."  301 F.3d at 395.  The First Circuit's approach in Southwestern Bell is

similar.  244 F.3d at 60.  Under these standards, Plaintiffs argue, the Board's minutes do

not suffice as a separate written decision under the Act.  Moreover, Indiana statute

requires that a zoning board "shall in all cases heard by it make written findings of fact,"

(Ind. Code § 36-7-4-915), which courts have interpreted to require specific findings that

enable a court to review the decision intelligently.  Carlton v. Board of Zoning Appeals,

245 N.E.2d 337 (Ind. 1969).  Plaintiffs maintain that the written decision rendered here by

the Board in its meeting minutes "is a mere restatement of the statutory requirements of

the [Dearborn County Zoning] Ordinances" and provides nothing beyond conclusory

statements.  Pls.' Mem. at 20.

The Board proposes that we adopt the approach taken in the Northern District of

Illinois in Primeco Personal Communications v. Village of Fox Lake, 26 F.Supp.2d 1052

(N.D. Ill. 1998).  In that case, the court, noting that the writing requirement was a matter

of first impression for the Seventh Circuit, sought "to predict how the Seventh Circuit would rule on the issue."  Id. at 1061.  The court analyzed the legislative context in which the Telecommunications Act was enacted and noted its "radical" intrusion into the traditionally local domain of land-use decisions.  The court reasoned that Congress could have, had it chosen to, articulated extensive requirements for the "in writing" provision of the Telecommunications Act (as, for example, it did for the writing requirement in the Administrative Procedure Act) – but it did not do so.  Therefore, the court concluded that, "given the comity interests implicated under these circumstances, we will not impute to Congress the intent to impose more of a burden than that expressly dictated by the Act." Id. at 1062.  Accordingly, a written denial "need only notify the applicant of the local government's decision denying the application."  Id. at 1061.  See also AT&T Wireless, 155 F.3d at 430 ("The simple requirement of a 'decision . . . in writing' cannot reasonably be inflated into a requirement of a 'statement of . . . findings and conclusions, and the reasons or basis therefor.'").

We find the Fox Lake court's reasoning persuasive, and hold that the Board's decision does fulfill the requirements of the Telecommunications Act.  The Board's written record of the denial enables us to "efficiently judge [its] findings and conclusions against the evidence and the record."  Illinois RSA No. 3, Inc. v. County of Peoria, 963 F.Supp. 732, 740 (C.D. Ill. 1997).  The fact that these findings are contained within the minutes of the meeting rather than in a separate document does not change our view.  See Fox Lake, 26 F.Supp. 2d 1052 (finding that the zoning body's minutes constituted a

writing under the Telecommunications Act).

Further, the Minutes make quite clear the reasons underlying the Board's decision, by specifying and describing the particular sections and sub-sections of the Ordinance which the Board considered Plaintiffs to have failed to satisfy.  The Board's approach permits meaningful judicial review, and therefore we see no statutory reason (nor do we think it was Congress's intention) to require zoning bodies to issue a formalized, judicial-type opinion.  We conclude that the Board's memorialization of the permit denial is sufficient under the plain meaning of the "in writing" requirement of the Telecommunications Act.  See Iowa Wireless Services v. City of Moline, 29 F.Supp.2d 915, 920 (C.D. Ill. 1998) ("This Court does not find that the statute requires . . . an elaborate denial."); see also APT Minneapolis, Inc. v. Eau Claire County, 80 F.Supp.2d 1014, 1020-21 (W.D. Wis. 1999) (upholding Board's decision as a "writing" in similar circumstances).

### B.     The Requirement that the Board's Denial be Supported by Substantial Evidence

Plaintiffs next argue that the Board's decision is not "supported by substantial evidence contained in a written record," as required by 47 U.S.C. § 332(c)(7)(B)(iii), and thus should be reversed.  Plaintiffs maintain that the Board merely parroted conclusory statements justifying its denial without having engaged in any reasoned analysis and that, in any event, no proper analysis would ever rationalize the Board's action.

Plaintiffs' contention that the Board's decision is not supported by substantial

22

evidence is based in large part on the fact that the denial was inconsistent with the recommendations of the Board's own experts, CMS and Nutting, following a lengthy and detailed consultative process between those experts and Plaintiffs.  CMS and Nutting determined, and so informed the Board, that Cincinnati Bell did have a coverage gap that would be remedied by the proposed WCF; that co-location of the facility with an existing WCF was not feasible; that Plaintiffs met all requirements of the Zoning Ordinance; that Plaintiffs had "complied with the spirit of the application to provide the least visually intrusive applications that they can"; and that they recommended approval of Plaintiffs' conditional use permit application.  R. 1718-19.[12]

Further, Plaintiffs claim, there are no adequate alternative sites for the WCF, and the Board has offered none.  The Board based its decision, in part, on the fact that Plaintiffs did not investigate "all hilltops and potential sites in the area."  R. 1706.

---

[12] Plaintiffs assert that this situation is analogous to Primeco II, in which a planning commission employed a consultant to analyze the availability of service coverage based on different antenna locations.  The consultant analyzed the data and concluded that, though alternative sites also provided high levels of coverage, their proximity to existing antennas would cause service interference; therefore, the alternative sites were deemed unsuitable by the consultant.  The planning commission denied the permit anyway on the basis that alternative locations provided adequate coverage, and ignored the interference issue.  352 F.3d at 1150 ("This [interference] concern seems not to have registered on the members of the planning commission.").  The Seventh Circuit reversed the board's decision holding that it was unsupported by substantial evidence.  Id.; see also Primeco I, 242 F.Supp.2d at 578 ("A decision that is based on the resolution of technical issues cannot be sustained under the substantial evidence standard where the determination was made based not on testimony and evidence in the record but rather on the adjudicator's own independent findings on the technical issues.").  Plaintiffs argue that the Dearborn County Board's contradiction of CMS and Nutting's recommendations in the case at bar demonstrates a similar dearth of evidence to support the permit denial.

However, Plaintiffs claim that they did investigate all feasible alternative locations and that the consultants concluded that co-location at one of those sites was not possible.  See APT Minneapolis v. City of Maplewood, 1998 WL 634224 at *5 (D. Minn. 1998) ("The City's mere allegation that other sites exist is not substantial evidence.").

Finally, Plaintiffs argue that generalized concerns about aesthetics constitute an insufficient basis for denial of a WCF application.  See Primeco II, 352 F.3d at 1150 ("If blanket opposition to poles could count as sufficient evidence for denying an application to build an antenna, the substantial-evidence provision of the Telecommunications Act would be set at naught.").  Plaintiffs assert that the complaints of neighboring landowners are nothing more than such generalized aesthetic concerns; moreover, the opinions rendered at the hearing about a possible decline in property values are entirely unsubstantiated and conclusory, as Mr. Elliott admitted when he could not quantify precisely what the loss of value might be.  R. 1735.

The Board maintains that its decision was based on substantial evidence and conformed with the provisions of the Zoning Ordinance.  Plaintiffs' application was found to be deficient with respect to three separate provisions: Section 315(b), which provides that the WCF must be harmonious and appropriate in appearance with the character of the vicinity and shall not change the essential character of the area; Section 315(d), which provides that the WCF will not impede the normal development and improvement of the surrounding property for uses permitted in the district; and Section 1514(5), which permits the Board to deny applications which fail to comply with the

provision of the Ordinance – specifically, the Board states, for "failing to adequately illustrate that all other hilltops and potential sites in the area had been investigated."  The Board asserts that, given the specific concerns raised by several remonstrators regarding aesthetics, property values, safety, and alternative available sites, its decision was well-grounded in the evidence and must be affirmed.

We cannot say that the Board's decision lacked the support of substantial evidence, at least with respect to Section 315(b).  It is clear that the Board was presented with, and evaluated, sufficient evidence to justify its denial of Plaintiffs' application on that single factor.[13]  The record indicates that numerous remonstrators voiced specific concerns about the appropriateness of the facility location, making clear their position that the proposed tower would be extremely visually intrusive to homes in the area.  Unlike the situation faced by the Court in Primeco II, these remonstrators were not simply expressing generalized dislike of "poles in general"; they came armed with specific objections regarding aesthetics, safety, the diminished value of their investments in surrounding properties, and the residential nature of the area surrounding the Helchers' property.

For example, Dearborn County resident, Karen Cody, presented a PowerPoint presentation in which, based upon balloon tests, she was able to illustrate the adverse

---

[13] We did not find substantial evidence having been submitted to the Board regarding any impediment to the normal development and improvement of the surrounding property or regarding the absence of evidence as to the inadequacy of other potential sites, given the consultants' conclusions and recommendations.

negative visual impact the tower would cause; she further testified that she and her husband had stopped making improvements to their log home in anticipation of a possible substantial decrease in the value of their property.  R. 1726.  Numerous residents testified as to the quiet, rural character of the neighborhood and to the devastating aesthetic and financial impact they anticipated the tower would have on that particular character of their homes.  Mr. Elliott, a certified real estate appraiser, testified at length as to his concerns that the tower would cast a long shadow over certain residences on Losekamp Road.  Mr. Dale, a planning and zoning consultant and certified planner, indicated that, in his professional opinion, Plaintiffs had not complied with the Zoning Ordinance in demonstrating that the chosen site did not have an adverse visual impact.  R. 1739.

All of this testimony from residents and others, taken together, provides a sufficient evidentiary basis for the Board's decision to deny the permit.  Their concerns were not based merely on a generalized aesthetic dislike of wireless towers; rather, they represent specific, reasoned objections related to the particular aesthetic character of the neighborhood.  As the Seventh Circuit has held, "Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic harmony is a prominent goal underlying almost every such code."  Aegerter v. City of Delafield, 174 F.3d 886, 891 (7th Cir. 1999).  Aesthetic judgments "must be grounded in the specifics of a case" in order to provide substantial evidence for zoning bodies' decisions under the Telecommunications Act, and, clearly, were so grounded here.  See Southwestern Bell

Mobile Systems v. Todd, 244 F.3d 51, 61 (1st Cir. 2001).[14]  We find this evidence

sufficient to justify the Board's decision.

     The case at bar is distinguishable from the Primeco line of cases regarding the

Board's decision to deny the permit in contravention of its experts' recommendation.  In

---

    [14] Plaintiffs question the expertise of Mr. Elliott, the certified real estate appraiser, on the basis that he could not specifically quantify the dimunition of property values likely to be caused by the proposed tower.  Mr. Elliott admitted to the Board that he had not personally conducted an appraisal on the matter and that he was merely informing the Board of his "guess" as to what the impact would be.  R. 1736.  Further, there is no proof, say Plaintiffs, that Mr. Elliott was qualified to testify as to potential ice or wind damage; his testimony on such issues "cannot be taken seriously."  Pls.' Resp. at 14.  Plaintiffs similarly dispute the findings of Mr. Dale, the zoning consultant, as to the visual impact of the tower.

    Plaintiffs are correct.  Mr. Elliott freely admitted that he had done no appraisals or studies on the likely dimunition of property values in the area.  All Mr. Elliott presented to the Board was his opinion that "there have been case laws found . . . in highly densely populated areas where the law has determined that you will lose value on your home in the presence of a cell tower.  And you know the funny part about it?  I can't sit up here and tell you how much in any of them because it never said.  All it says is the courts have determined that there is a loss of value. . . . [I]n Dearborn County . . . you'll never get those kind of statistics because . . . we don't have the population density."  R. 1735.  This statement, which was neither an opinion based on Mr. Elliott's expertise as a real estate appraiser or supplemented by any other concrete facts is, in itself, insufficient evidence to support the Board's denial.

    Plaintiffs' additional basis for reversal of the Board's decision to deny their application is that certain materials provided at the hearing didn't constitute substantial evidence – specifically, a letter from Ms. Lehner, counsel for one of the adjoining landowners, which it appears was provided to the Board at the hearing.  R. 1432-40.  Plaintiffs claim they were not given access to this letter, as only a limited number of copies were available, and note that in any event one Board member admitted that he had not read all of the "over the table" information rendered at the hearing.  R. 1705.  Thus, Plaintiffs contend that the letter must not be considered part of the record supporting the Board's decision.  Pls.' Mem. at 10-11.  Further, if it were to be considered part of the record, there is doubt concerning whether the handwritten notes of one Board member demonstrate that the Board itself refuted the assertions contained therein, and whether affidavits related to these notes are admissible for our consideration.  Pls.' Mem. at 11-12; Defs.' Resp. at 25; Pls.' Reply at 2-6.  We decline to be mired in these questions, noting that it appears to us that the contents of the letter are largely replicative of testimony given (by Ms. Lehner and others) at the hearing.  While we are left with serious doubts regarding the sufficiency of the evidence in support of the Board's decision, we decline to resolve these controversies in favor of Plaintiffs, given our prior ruling upholding the Board's decision on other grounds.

Primeco I and II, the zoning board's decision lacked a substantial evidentiary basis in part

because the board took it upon itself to independently evaluate technical data about

coverage and interference and ultimately reached different (and, according to the courts,

inaccurate) conclusions than those of its expert consultant.  That is not what occurred

here.  The record here does not indicate that the Board second-guessed or disagreed with

the technical studies of CMS and Nutting, as the zoning board did in the Primeco cases.[15]

Rather, the Board largely (and permissibly) based its decision on provisions in Article 3

of the Ordinance – concerning aesthetics, property values, and the harmonious character

of the area – notwithstanding the technical studies of the experts.  The Board maintains

that Nutting and CMS were retained merely to review compliance with Article 15, which

specifically concerns wireless communications facilities, and not Article 3, which pertains

to nonconforming uses generally.  In so doing, the Board did not "relinquish or delegate

its authority and ability to make final determinations regarding whether to grant an

application for conditional use."  Defs.' Resp. at 25.[16]

_____

[15] The Board does mention that doubt was cast upon the consultants' eventual
*recommendation* for WCF placement, but not its technical findings.  These were based primarily
on the Board's conclusion that the consultants did not adequately assess the visual impact of the
proposed tower on surrounding properties.  This situation is readily distinguishable from that in
Primeco, in which the board independently interpreted *scientific*, not aesthetic, data in
contravention of the experts' review.

[16] Plaintiffs dispute the Board's contention that the consultants were intended to evaluate
compliance only with Article 15, not Article 3.  Plaintiffs complain that this approach "zone[s]
them out," citing page 1933 of the Record.  This citation is an excerpt from a 2001 Board
meeting in which a representative of H.C. Nutting informed the Board that, regarding wireless
towers, "[y]ou may not zone them out."  It is unclear to us what Plaintiffs mean by this citation
or what relevance such a statement has;  it perhaps is a reference to the effective prohibition

(continued...)

Finally, the Board maintains that, in contravention of Section 1514(5), Plaintiffs failed to adequately illustrate that all other potential locations in the area had been investigated.  Though Plaintiffs assert that this "mere allegation" cannot serve as a basis for denial of its application, we conclude that the Board's claim is supported by substantial evidence.  Plaintiffs claim that three alternative co-location sites were reviewed and rejected, but mention of only three alternatives is far from the required "detailed explanation . . . as to why a site of a higher priority was not selected" as dictated by Section 1514.[17]  Such a limited investigation is insufficient and fails to comply with the provisions of the Ordinance.  The description in the report submitted by Plaintiff, at pages 1307-1310 of the record, includes some details regarding the three existing towers upon which CBW could potentially co-locate the new WCF and why each of these sites is unsuitable.[18]  However, Plaintiffs gloss over the fact that while co-location of a WCF upon an existing structure is the "first priority" location preference, there are *six*

---

[16](...continued)
clause of the Telecommunications Act.  In any event, the Board's explanation of the consultants' role appears plausible to us.

[17] As noted previously, land zoned "agricultural" is the second-to-last priority zone of the nine possible zones for location of wireless facilities; therefore, seven zones are given a higher priority and none was selected.

[18] For example, the report states with respect to one existing facility that "Cincinnati Bell Wireless has considered collocation [co-location] on the existing West Harrison guyed tower on North Dearborn Road.  A structural analysis was performed by a Professional Engineer Registered in the State of Indiana, Paul J. Ford and Company, to determine structural capability. The findings were that the tower is in poor physical condition and therefore is incapable of supporting additional loads.  In addition, this site does not give the line of sight required to reach Cincinnati Bell Wireless' coverage objective to provide service along Jamison Road."  R. 1308.

*additional categories* which are also preferable to agriculturally zoned property such as that owned by the Helchers.[19]  As to each of these categories, Plaintiffs' statement of compliance consists solely of the following boilerplate statement:

> Within or in reasonable proximity of the search area where new antennae is [sic] required to provide complete and competitive coverage there exists no property zoned [zoning designation] that accommodates the RF engineering requirements of the proposed Cincinnati Bell Wireless network expansion.[20]

These generic, nonspecific statements are unsupported by any explanation, evidence of investigation, or other description indicating that credence is to be granted to Plaintiffs' claims that all other sites were adequately investigated.  Clearly, this submission fails to qualify as a "detailed explanation," as required by the Ordinance.[21] Based upon these factors, we cannot conclude that the Board's assertion that alternatives had not been sufficiently investigated lacked a substantial evidentiary basis.

---

[19] These priorities are, in order of preference, property zoned Manufacturing Three (M - 3); property zoned Manufacturing Two (M - 2); property zoned Manufacturing One (M - 1); property zoned Highway Interchange (H - 1); property zoned General Business (B - 2); and property zoned Restricted Business (B - 1).

[20] R. 1309-10.

[21] The Board's briefings would certainly have benefitted from their providing Plaintiffs with specific suggestions of potential alternative locations for the WCF, rather than simply suggesting that Plaintiffs should have considered "other hilltops . . . in the area."  However, Plaintiffs' failure to provide the "detailed explanation" required by the Ordinance is far more crucial.  In APT Minneapolis, the Court stated that a City's mere allegation of the existence of alternative sites was not substantial evidence was trumped by Plaintiffs' failure to provide a detailed explanation which ultimately rendered their permit application inadequate from the outset.  Before the Board was required to prove anything, Plaintiffs had an initial responsibility to furnish a full and complete application that adequately illustrated the lack of alternative locations, and they failed to do so.

### C.   *The Requirement that the Board May Not Unreasonably Discriminate Among Wireless Service Providers*

Plaintiffs next contend that the Board's decision unreasonably discriminated against Cincinnati Bell in comparison to other wireless service providers, in violation of 47 U.S.C. § 32(c)(7)(B)(i)(I).  In support of this assertion, Plaintiffs maintain that, as a result of the Board's denial, Cincinnati Bell will be unable to provide viable competition to carriers who have no coverage gaps in Dearborn County.  Plaintiffs maintain that "unreasonable discrimination" occurred here, based on the Board's reliance on improper zoning criteria and its "blatant disregard" of the provisions of the Ordinance.

Plaintiffs' claim fails because they have not sufficiently alleged or proven unreasonable discrimination on the part of the Board.  The unreasonable discrimination provision of the Telecommunications Act does not prevent zoning bodies from making decisions and the necessary choices entrusted to them, based on traditional zoning criteria, including aesthetic concerns.  See AT&T Wireless, Inc. v. Town of Porter, 203 F.Supp.2d 985, 1000 (N.D. Ind. 2002).  As discussed above, the Board's reasons for denial of Plaintiffs' permit were legitimate and based firmly upon the provisions of the Zoning Ordinance.  In addition, Cincinnati Bell has not identified by name *any* other carriers in Dearborn County who were treated more favorably by the Board or who do not have no coverage gaps in the county.  Plaintiffs cannot demonstrate discrimination in the abstract without providing any comparative factual references respecting their purported competitors in the Dearborn County area or any preferential treatment allowed another

provider by the Board.

### D. The Requirement that the Board May Not Effectively Prohibit the Provision of Personal Wireless Services

Finally, Plaintiffs claim that the Board's denial effectively prohibits the provision of personal wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Wireless services may be considered effectively prohibited if a wireless provider is prevented from closing a "significant gap" in wireless service coverage. See MetroPCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 731 (9th Cir. 2005). Plaintiffs remind us that the Board's experts testified at the hearing that Plaintiffs had demonstrated the existence of a coverage gap, which the proposed WCF would ameliorate. R. 1718-19.

The effective prohibition clause in the Telecommunications Act can be applied to single zoning decisions; it is not necessary in order to prevail on this claim that Plaintiffs demonstrate a consistent pattern of denials. However, the unrequited provider must establish more than merely a denial of an opportunity to fill a gap in service. See VoiceStream, 342 F.3d at 833. The provider must demonstrate that its application is the only feasible plan for filling the coverage gap and that there are no other solutions to the purported problem. Id. The provider is faced with the "heavy" burden of proving that no alternatives to its proposed facility exist. Id. (quoting Second Generation Properties, LP v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002)).[22]

---

[22] We note that, unlike the question of whether the Board's decision was supported by substantial evidence, the effective prohibition issue is reviewed *de novo*. VoiceStream

(continued...)

Plaintiffs have made no such showing here.  Though Plaintiffs did compare three alternative sites for co-location and discuss the reasons they would be unsuitable as well as provide technical evidence to the Board demonstrating as much (see R. 1169-71, 1204-10), they offered no proof that the Losekamp Road site was the only feasible location for the proposed facility nor that the location on another neighboring hilltop in a non-residential area would be impossible or impractical.  As discussed above, Plaintiffs' statement of compliance regarding higher-priority preferred locations was substantially deficient in that it contained nothing beyond boilerplate, conclusory statements as to the six categories of land preferred over the proposed site.

In <u>VoiceStream</u>, the Seventh Circuit held that a "disparity in substance" between information supplied by an applicant regarding a proposed site and alternative sites is "telling" regarding the effective prohibition issue.  342 F.3d at 836.  While the applicant had provided extensive maps, diagrams, and assessments for the desired site, the record contained only conclusory statements as to alternative sites.  The Court held that "[s]uch conclusory statements, without more, are insufficient to establish that the applicant has exhausted thoroughly the possibility of other viable alternatives . . . [or] to prove that the [board's] denial . . . 'prohibits or has the effect of prohibiting the provision of personal wireless services.'"  <u>Id.</u>  This reasoning applies with equal force here.

The effective prohibition clause requires an applicant to show "not just that this

---

[22](...continued)
<u>Minneapolis v. St. Croix County</u>, 342 F.3d 818, 832 n. 6 (7th Cir. 2003).

application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Id. at 833 (quoting Town of Pelham, 313 F.3d at 629). Plaintiffs' assertions fell critically short of this mark.


## IV.    Conclusion

Having concluded that the Board's decision was based on substantial evidence and was fully compliant with procedures required by the Telecommunications Act, we GRANT Defendants' Motion for Partial Summary Judgment (which, as we have stated previously, we have treated as a motion to affirm the Board's denial of Plaintiffs' permit request) and DENY Plaintiffs' Motion to Reverse the Decision of the Board. IT IS SO ORDERED.


Date: _____07/31/2007_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Robert Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
jlowe@k-glaw.com

Holland N. McTyeire V
GREENEBAUM DOLL & MCDONALD PLLC
hnm@gdm.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com

William Edward Skees
GREENEBAUM DOLL & MCDONALD PLLC
wes@gdm.com

Helen Annette Thompson
GREENEBAUM DOLL & McDONALD PLLC
hat@gdm.com